**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

SOLOMON D. SIMMONS, JR.,

                Plaintiff,

v.                                                                                      ACTION NO. 2:13cv665

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                Defendant.

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff Solomon D. Simmons, Jr., brought this action under 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be AFFIRMED.

**I. PROCEDURAL BACKGROUND**

Mr. Simmons applied for SSI on June 20, 2011, alleging disability since December 1,

2010,[1] caused by intermittent vertigo. R. 123, 149.[2] Mr. Simmons's applications were denied initially and on reconsideration. R. 70-86. Mr. Simmons requested a hearing by an Administrative Law Judge (ALJ), which occurred on July 11, 2012. R. 26-62. Mr. Simmons was represented by counsel, and testified before the ALJ, along with a vocational expert. R. 26.

On July 16, 2012, the ALJ found that Mr. Simmons was not disabled within the meaning of the Social Security Act. R. 22. The Appeals Council denied Mr. Simmons's request for administrative review of the ALJ's decision.[3] R. 1-6. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

Mr. Simmons timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g). On March 24, 2014, Mr. Simmons moved for summary judgment. ECF No. 10. Defendant filed a cross-motion for summary judgment on April 23, 2014, and Plaintiff filed a response to the motion on May 8, 2014. ECF Nos. 11 and 15. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Born in 1971, Mr. Simmons was forty years old on his alleged onset date of June 17, 2011, and forty-one years old at the time of his administrative hearing and the ALJ's decision. R. 13, 123. Mr. Simmons graduated high school, and attended two years of college. R. 20, 32.

---

[1] Mr. Simmons amended his alleged onset date from December 1, 2010, to June 17, 2011, during his hearing before the Administrative Law Judge. R. 30.
[2] The citations in this Report and Recommendation are to the Administrative Record.
[3] In denying review, the Appeals Council addressed evidence Mr. Simmons presented after the administrative hearing. R. 2. The Appeals Council indicated medical records from Michael G. Charles, M.D., dated November 18, 2011 through February 15, 2012, were copies of records already in the record. R. 2. Further, the Appeals Council found a statement from Dr. Charles dated October 2, 2012 was new information that would not affect the ALJ's decision about whether Mr. Simmons was disabled prior to July 16, 2012, the date of the ALJ's decision. R. 2. The October 2, 2012 statement reads in its entirety, "[t]his is to confirm that Solomon D. Simmons has chronic Meniere's disease, and experiences episodes 2-3 times a week." R. 7.

He has past relevant work as a property investor, a newspaper deliverer, and a surgical technologist. R. 20, 150.

### A. Medical Background

On December 22, 2010, a rescue vehicle transported Mr. Simmons from the side of the road, where he had pulled over due to dizziness, to the emergency room. R. 220-22. Mr. Simmons stated he had never had this problem before, and that it had started within the last few days. R. 222. He was diagnosed with peripheral vertigo, given an IV, given a prescription for Meclizine, and discharged the same day with a steady gait. R. 220, 263.

Mr. Simmons was seen at the emergency room on July 15, 2011 for pain beginning the previous day in his lower abdomen, lower back, down his legs, down his arm, and sometimes up to his head. R. 268. A review of symptoms was positive for tinnitus, occasional dizziness, and back pain, and negative for all other systems reviewed. R. 269.

Dr. Michael G. Charles, M.D., wrote a letter on September 9, 2011, stating Mr. Simmons was seen in his office that day, had a history of tinnitus and vertigo, and was being referred to an ENT specialist. R. 280.

On October 18, 2011, David B. Dorofi, M.D., with Ear, Nose and Throat, Ltd., examined Mr. Simmons following a referral by Dr. Charles for evaluation of mild loss of hearing involving the right ear, which began two years earlier. R. 216. The ear exam was normal, and Mr. Simmons could hear conversational voices. R. 217. His external ear was normal with no auricle leasion or tenderness to palpation present, his external auditory canals were within normal limits without lesions or discharge. R. 217-18. An otoscopic exam revealed a normal tympanic membrane, no lesions or perforations, and no fluid. R. 218. A Hallpike test was negative. R. 218. Dr. Dorofi concluded an audiogram revealed "very mild bilateral SNHL [sensorineural

hearing loss], speech discrimination 100% bilateral, tympanograms normal, reflexes intact, decay negative."   R. 218, 289-90.   The undersigned notes that the Audiologic Evaluation dated October 18, 2011, states Mr. Simmons's results were within normal limits for both ears, and symmetric.  R. 289.  Mr. Simmons was instructed to avoid excessive noise exposure and to wear protection while exposed to excessive noise.   R. 218.   Dr. Dorofi stated Mr. Simmons's symptoms may be due to Meniere's disease, but that other causes of vertigo needed to be ruled out.  R. 218.

On November 4, 2011, an MRI was taken of Mr. Simmons's brain, with special attention to the eighth nerves due to his history of vertigo.  R. 298.  Carol Ashman, M.D., a radiologist, interpreted the results, finding "no abnormal enhancement or enhancing mass along the seventh or eighth cranial nerves."  R. 298.  Dr. Ashman's impression was that "no abnormality is seen to account for the clinical symptomatology."  R. 298.

A Videonystagmorgraphy (VNG) test was performed on Mr. Simmons's ears on November 9, 2011.  R. 291.  The results showed that five of the six areas tested were within normal limits; however, Mr. Simmons had a caloric weakness of 43% in the left ear.  R. 291. The notes also indicate that the 6% directional preponderance to the left does not meet the criterion for significance.  R. 291.  All ocular-motor testing was normal.  R. 291.

Mr. Simmons returned to Dr. Dorofi on November 18, 2011 with complaints of "vertigo lasting for a few hours, fluctuating right hearing loss, fluctuating right ear fullness, [and] occasional right tinnitus."  R. 299.  Mr. Simmons stated the symptoms had been present for two years.  R. 299.  Mr. Simmons's ear exam was normal, and Dr. Dorofi noted Mr. Simmons could hear "to conversational voice."  R. 300-01.  Dr. Dorofi assessed sensorineural hearing loss, subjective tinnitus, active Meniere's disease, and vertigo.  R. 300.  Based on Mr. Simmons's

4

history and symptoms, Dr. Dorofi felt the symptoms were most likely due to right Meniere's disease. R. 301.

Mr. Simmons was treated by Dr. Charles for dizziness on February 15, 2012. R. 283. Dr. Charles assessed vertigo and Meniere disease, and prescribed Meclizine and Prednisone. R. 283.

### B. Disability Reports

Mr. Simmons indicated in an undated Function Report that his daily activities included watching television, working at night, exercising, reading, praying, and watching his children. R. 164. He stated that he cooked meals for his children, and drove them to activities. R. 165. Mr. Simmons noted that he prepared his own meals daily, cut grass, and cleaned the bathroom. R. 166. He drove daily and shopped for groceries weekly. R. 168.

Mr. Simmons also completed an undated Disability Report – Appeal, indicating he had suffered from vertigo "at least 5 times" since December 22, 2010, and that he could not drive or move when it occured. R. 174.

On March 27, 2012, Mr. Simmons's mother wrote a letter stating Mr. Simmons had been living with her since July 2011, and had been unable to work during that time due to his disability. R. 210.

### C. Disability Determination Explanations

On July 19, 2011, Patricia Staehr, M.D., reviewed Mr. Simmons's file. R. 71-76. Dr. Staehr noted that Mr. Simmons stated his vertigo was intermittent, but that the December 22, 2010 episode was the only one that required an emergency room visit. R. 73. After considering the medical records, Mr. Simmons's statements, and how the condition affected his ability to work, Dr. Staehr concluded Mr. Simmons's impairments were non-severe. R. 74.

Ralph Hellams, M.D., reviewed the file on October 25, 2011, and concluded the records did not indicate a worsening of Mr. Simmons's medical condition. R. 81. Dr. Hellams also found Mr. Simmons's impairments were non-severe, and that he was not disabled. R. 82, 85. Dr. Hellams found Mr. Simmons had no exertional, manipulative, visual, or communicative limitations. R. 83. Dr. Hellams found Mr. Simmons had the following postural and environmental limitations, and should: never climb ladders, ropes or scaffolds; only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; and, avoid concentrated exposure to hazards such as machinery or heights. R. 83-84.

### D. The Administrative Hearing – March 13, 2012

At the outset of the administrative hearing, Mr. Simmons amended his alleged onset date to June 17, 2011, the date of his application. R. 30. Mr. Simmons testified at his administrative hearing that he lived with his mother, and her significant other. R. 31. His children, ages sixteen, eighteen, and twenty, lived with their mother. R. 58.

After his alleged onset date, Mr. Simmons worked as a loader at UPS for one month. R. 32-33. Mr. Simmons also delivered papers for the Virginian Pilot for four to five months, working two to three hours a day. R. 33-34. Mr. Simmons had previously worked in real estate investment for fourteen years, buying houses, renting houses, and refinancing houses. R. 39-41, 43-44. Mr. Simmons admitted to never filing a tax return, because he did not think it was necessary as he did not owe any taxes. R. 41-42.

Mr. Simmons experienced his first episode on December 22, 2010 while driving, and had to be taken to the emergency room. R. 38. He was diagnosed with tinnitus, vertigo, and Meniere's disease. R. 45. Mr. Simmons testified that he could see and hear fine. R. 46. He testified to having a flare up approximately twice a week, which incapacitated him and required

him to lie down. R. 47. The flare up could last anywhere from one to twenty-four hours. R. 48. Mr. Simmons was prescribed Meclizine and Prednisone, which he took when he had an episode. R. 50-51. The medications worked "fairly quickly," and helped him "feel a little better," but did not cure him. R. 51. Mr. Simmons had not had any kind of vestibular or balance physical therapy. R. 45-46.

When he was not having a flare up, Mr. Simmons testified that he could sit, stand, walk, run, lift, and carry without any problem. R. 52. Mr. Simmons testified that he drove approximately three days a week, though his doctor had recommended that he not drive. R. 38.

### E. The ALJ's Decision – July 16, 2012

The ALJ found Mr. Simmons had not been disabled, as defined by the Social Security Act, from June 17, 2011, through the date of the decision. R. 21. At step one of the five-step analysis, the ALJ concluded that Mr. Simmons's work as a newspaper deliverer and UPS loader did not rise to the level of substantial gainful activity; therefore, Mr. Simmons had not engaged in substantial gainful activity since June 17, 2011, the alleged onset date. R. 15. At step two, the ALJ found that Mr. Simmons's vertigo, tinnitus, and Meniere's disease were severe impairments. R. 15. The ALJ found Plaintiff's other impairments, including his hearing loss were non-severe. R. 16. At the third step, the ALJ concluded Mr. Simmons did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 16.

The ALJ found Mr. Simmons had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with no climbing, no exposure to heights and hazards, and no more than occasional postural activities. R. 16. In reaching this conclusion, the ALJ summarized Mr. Simmons's testimony regarding his flare-ups of vertigo and dizziness. R. 16-

17. The ALJ found Mr. Simmons's statements concerning the intensity, persistence and limiting effects of his symptoms were not fully credible. R. 17. The ALJ summarized the medical history. R. 18-20. The ALJ assigned moderate weight to the opinions of the State agency physicians, which he found to be somewhat consistent with the record. R. 19. The ALJ concluded Mr. Simmons had the residual functional capacity to "perform a full range of work at all exertional levels," but could perform no more than occasional postural activities, no climbing, and must avoid exposure to heights and hazards. R. 16.

At step four, the ALJ found Mr. Simmons was not capable of performing any of his past relevant work. R. 20. The ALJ found at step five that, with Mr. Simmons's age, education, and residual functional capacity, there were jobs that exist in the national economy he could perform, such as office helper, information clerk, and office clerk. R. 21.

Mr. Simmons argues there is not substantial evidence in the record to support the ALJ's finding at step three of the administrative process that Mr. Simmons did not meet a listed impairment. Pl.'s Mot. 1. The undersigned disagrees, finding there is substantial evidence in the record to support the ALJ's decision, and recommending that the decision of the Commissioner be AFFIRMED.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the [Secretary's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI, an individual must be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a)

(2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents him from past relevant work, and (5) has an impairment that prevents him from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

Mr. Simmons argues the ALJ erred at step three of the sequential analysis by finding his impairments did not meet or equal a Listing, specifically Listing 2.07. Pl.'s Mem. 1; Pl.'s Reply 1. The Listing of Impairments describes those impairments that are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525. An impairment meets the requirements of a listing "when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." 20 C.F.R. § 404.1525.

Mr. Simmons argues that because he was diagnosed with Meniere's disease and has caloric tests showing hearing loss, he meets a listing. Pl.'s Mem. 1-2. However, "[y]our

impairment(s) cannot meet the criteria of a listing based only on a diagnosis. To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525.

> Listing 2.07 states the following:
>
>> Disturbance of labyrinthine-vestibular function (including Ménière's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:
>>
>> A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
>>
>> B. Hearing loss established by audiometry.

20 C.F.R. § Pt. 404, Subpt. P, App. 1. The ALJ found Mr. Simmons's vertigo, tinnitus, and Meniere's disease constituted severe impairments. R. 15. The ALJ then evaluated these impairments under section 2.00 of the Listings (Special Senses and Speech), which includes Listing 2.07. R. 16. The ALJ found, that although the impairments were severe, "these impairments are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing of Impairments." R. 16.

There is substantial evidence in the record to support the ALJ's finding. First, Mr. Simmons has not established a progressive loss of hearing. Dr. Dorofi performed an ear exam on October 18, 2011, which was normal. R. 217. While Dr. Dorofi's found an audiogram revealed that Mr. Simmons had "very mild bilateral" hearing loss, he further found Mr. Simmons could hear conversational voice. R. 217-18. In addition, the audiogram indicated results within normal limits. R. 289. A test performed November 9, 2011 revealed a caloric weakness of 43% in Mr. Simmons's left ear, but five other areas tested were normal. R. 291. Dr. Dorofi performed a

11

second ear exam on November 18, 2011, which was normal, and Dr. Dorofi again noted Mr. Simmons could hear at a conversational level. R. 300-01.

Mr. Simmons's own statements in the record do not allege hearing loss, much less a progressive hearing loss. When Mr. Simmons completed the Adult Function Report, he did not indicate that he had any problems with hearing. R. 169. During his administrative hearing held March 13, 2012, Mr. Simmons was able to hear, and he indicated that his hearing was "fine." R. 46. Accordingly, Mr. Simmons does not meet the criteria of Listing 2.07 that requires progressive hearing loss.

Second, with respect to Meniere's disease, the introduction to Listing 2.00 states, "the severity of impairment is best determined after prolonged observation and serial examinations." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. [4] Mr. Simmons has a very short treatment history. His first episode occurred December 22, 2010. R. 220-22. He was treated next on July 15, 2011. R. 168-69. The remaining treatment records are for September 9, 2011, November 18, 2011, and February 15, 2012. R. 268-69, 283, 299-301. Mr. Simmons was also referred for hearing tests

---

[4] The introduction to Listing 2.00 includes the following discussion, "C. How do we evaluate vertigo associated with disturbances of labyrinthine-vestibular function, including Meniere's disease?
1. These disturbances of balance are characterized by an hallucination of motion or loss of position sense and a sensation of dizziness which may be constant or may occur in paroxysmal attacks. Nausea, vomiting, ataxia, and incapacitation are frequently observed, particularly during the acute attack. It is important to differentiate the report of rotary vertigo from that of 'dizziness' which is described as lightheadedness, unsteadiness, confusion, or syncope.
2. Ménière's disease is characterized by paroxysmal attacks of vertigo, tinnitus, and fluctuating hearing loss. Remissions are unpredictable and irregular, but may be longlasting; hence, the severity of impairment is best determined after prolonged observation and serial reexaminations.
3. The diagnosis of a vestibular disorder requires a comprehensive neuro-otolaryngologic examination with a detailed description of the vertiginous episodes, including notation of frequency, severity, and duration of the attacks. Pure tone and speech audiometry with the appropriate special examinations, such as Bekesy audiometry, are necessary. Vestibular functions is assessed by positional and caloric testing, preferably by electronystagmography. When polytomograms, contrast radiography, or other special tests have been performed, copies of the reports of these tests should be obtained in addition to appropriate medically acceptable imaging reports of the skull and temporal bone. Medically acceptable imaging includes, but is not limited to, x-ray imaging, computerized axial tomography (CAT scan) or magnetic resonance imaging (MRI), with or without contrast material, myelography, and radionuclear bone scans. 'Appropriate' means that the technique used is the proper one to support the evaluation and diagnosis of the impairment." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

and an MRI, which occurred in October and November 2011. R. 216-18, 291, 298. This short treatment record does not lend itself to "prolonged observation and serial examinations."

In further support of the ALJ's finding, both state agency physicians who reviewed Mr. Simmons's file concluded he did not meet or equal a listed impairment. R. 72, 77. Mr. Simmons has failed to carry his burden at Step Three of the sequential analysis to prove his impairments meet or equal the requirements of a listing, and substantial evidence in the record supports the ALJ's finding.

## V. **RECOMMENDATION**

For the foregoing reasons, the Court recommends that Mr. Simmons's Motion for Summary Judgment (ECF No. 10) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## VI. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
November 12, 2014